```
        IN THE UNITED STATES DISTRICT COURT    FILED
         FOR THE NORTHERN DISTRICT OF ALABAMA
                    MIDDLE DIVISION         99 MAR 26 PM 2:44

FLORENCE FOSTER,              }              U.S. DISTRICT COURT
                              }                N.D. OF ALABAMA
     Plaintiff,               }
                              }     CIVIL ACTION NO.
v.                            }
                              }     97-AR-3318-M          ENTERED
RENFRO CORPORATION,           }
                              }                        MAR 26 1999
     Defendant.               }
```

## MEMORANDUM OPINION

The court has before it motions by defendant, Renfro Corporation ("Renfro"), for judgment as a matter of law pursuant to Rule 50(a), F.R.Civ.P. These motions were filed at the conclusion of the evidence offered at trial by plaintiff, Florence Foster ("Foster"), and again after both sides had rested. The court took Renfro's said motions under advisement and submitted the case to the jury. In order to give the parties an opportunity to brief the issues presented by Renfro's Rule 50 motions, the court has not entered a judgment on the verdicts rendered by the jury pursuant to special interrogatories. Ostensibly pursuant to Rule 50(b), F.R.Civ.P., Renfro has filed an alternative motion for a new trial, which is premature because there is, as yet, no "judgment". If and when timely filed, a motion for new trial will be ruled upon.

Foster, who is black, was an employee of Renfro, a sock manufacturer. During an appeal by Foster to the Eleventh Circuit from a dismissal of her Title VII claim of race discrimination



against Renfro's predecessor corporation, Foster was terminated by Renfro. During the considerable period of time Foster worked for that predecessor, most, if not all, of the management people at the sock plant held the same positions they held at the time Renfro was terminated. They were involved in the termination decision in varying degrees. Several of them had been featured in Foster's failed Title VII suit. At the time of the firing they were clearly aware of Foster's ongoing claim of racial discrimination.

Foster had an exemplary employment record as a long-time worker at the plant. The only "blemish" on it was her Title VII claim. She was fired after having left work five minutes before quitting time for a hair appointment and having a fellow employee check her out on the time clock. The "legitimate" reason articulated by Renfro for its decision to terminate her was its absolute rule against the falsification of time records.

In a civilized society, termination is the most drastic discipline an employer can impose on an employee. At Foster's hourly pay rate Foster "stole" (this is the word used by Renfro during closing argument) less than one dollar from her employer by having left five minutes early.

Renfro's published "Guidelines" for its employees, as they existed on the date of Foster's termination, provided, *inter alia*:

> In all cases requiring discipline, the facts <u>as well as any extenuating circumstances</u> will be considered before any action is taken.
> 
> \*\*\*
> 
> Infractions of the following rules will <u>normally</u> result in discharge

2

>     for the first offense:
>
>     (37) Falsification of company records or documents, including the
>     falsification of production or time records.

(emphasis supplied).

Was Renfro simply waiting for Foster to make a mistake in order to provide a "legitimate" reason for Renfro to discipline her in retaliation for her having availed herself of a Title VII remedy?  The jury apparently found this argument persuasive because in its answers to special interrogatories it found the existence of retaliatory motive by Renfro and ordered it to compensate Foster in the sum of $50,000 for her lost wages and other employee benefits.  It also awarded Foster $100,000 for her emotional distress.

Foster did not _personally_ "falsify" her check-out time on the occasion in question.  The actual, physical "falsification," was by the person who punched the clock five minutes after Foster had departed the premises, and yet that person was not fired, perhaps because firing under such circumstances would not be  "normal," or perhaps because of "extenuating circumstances," or perhaps because of an ambiguity in the Guideline rule under this set of facts.  No evidence was offered that any other employee had ever been disciplined, much less so severely disciplined, for the same or similar conduct.

The jury further found that Foster had proven "by a preponderance of the evidence that Renfro's act of retaliation was with malice or reckless indifference to Foster's federally protected rights."  After receiving this answer from the jury the

3

court was prepared to submit to the same jury the question of how much, if any, punitive damages should be imposed upon Renfro, but Foster decided not to proceed with her punitive damages quest and to be satisfied with the rather sizeable sum of $150,000 in actual damages.

There was no evidence of Foster's having undertaken to mitigate her damages in any real way. The only thing she did by way of a job search after being terminated was to apply for unemployment compensation, an endeavor which required her to formally apply with the appropriate state agency for other employment. She never followed up and never actively sought another job, whether or not comparable to the job she had held at Renfro.

On December 31, 1994, Renfro's predecessor (whose pension obligations Renfro inherited) notified Foster that her pension would be fully vested on April 1, 1997, and that her estimated monthly retirement benefit at age 65 (December 1, 2002) would be $802, which included Social Security benefits. Foster was fired on March 6, 1997, less than one month before her pension arguably vested. This may or may not have contributed to her mental anguish and to the size of the jury verdict on her said claim. Whether the jury had enough evidence to reasonably calculate Foster's loss of pension benefits is debatable. Her counsel never mentioned pension benefits in his closing argument and urged the jury to award lost wages of $36,000, a sum arrived at without giving Renfro credit for

any sums Foster might have earned by efforts at mitigation. On the other hand, Renfro offered undisputed evidence that jobs comparable to Foster's job and skill level were available among the local sock manufacturers, so, for aught appearing, Foster could have readily duplicated her wages elsewhere if she had been ready, willing and able to work.

The court's first draft of special jury interrogatories, shared with counsel, used the words "amount of pay" in the question designed to obtain from the jury a quantification of Foster's alleged out-of-pocket losses, that is, if the jury first found liability. After realizing that Foster was also seeking pension benefits, the court amended its said question so as to permit the quantification of "the amount of pay <u>and other benefits</u>." (emphasis supplied). As the court recalls it, the said revised jury interrogatories were distributed to counsel before their closing arguments, but there was no colloquy between the court and counsel about the revision before the arguments. The court does not know whether or not Renfro's counsel read the revised jury interrogatories before they made their closing arguments. Right or wrong, the court thought that it had a right to assume that when counsel received the final draft of jury interrogatories that they would read them to see what, if any, differences there were between the final and the earlier drafts. Counsel for Renfro say that they did not have knowledge of the court's addition of the words "and other benefits" until after the case had gone to the jury. The

5

court has no reason to doubt counsel's assertion in this regard. Constructive knowledge may be another matter. The court certainly had no intent to prejudice Renfro or to slip up on it. While charging the jury, the court read aloud the revised interrogatory which contained the words "and other benefits," and counsel heard, or had no reason <u>not</u> to hear, what the court was sharing *in haec verba* with the jury. During the opportunity to take exceptions to the charge (part of which was a reading of the interrogatories), Renfro's counsel offered no objection to the court's use of the words "and other benefits."

While the jury was deliberating, the jury sent the following written inquiries to the court:

> Can we restore her medical benefits & have her fully vested in her pension.
>
> Are we allowed to award more dollars in damages than was requested & can attorneys fees be included in this amount.

The court declined to answer the jury's said inquiries, believing that any attempt to do so would open a can of worms, and that to answer some of the questions and not others would be confusing and perhaps prejudicial. The oral instructions on recoverable damages had, of course, opened the door for the jury to quantify lost <u>non</u>-wage monetary losses if the jury found that such "other benefits" had been lost. The instructions had contained nothing whatsoever to suggest that an attorneys fee was a recoverable element of damage.

Because the court now concludes, as a matter of law, that

Foster did not meet her unavoidable obligation to mitigate her out-of-pocket damages, and because she did not meet her burden of proving lost pension benefits, leaving them speculative, Renfro's Rule 50 motions, insofar as they relate to the jury's award of $50,000 for "lost pay and other benefits," are due to be granted. Foster's claims for lost pay and other benefits are therefore due to be dismissed.

Because the court now concludes that Foster did present substantial evidence of employee retaliation in response to her still pending Title VII claim, as well as evidence of her consequent humiliation and distress, the court will deny Renfro's Rule 50 motions, insofar as the $100,000 jury award for mental anguish is concerned, and will enter judgment on the verdict against Renfro in that amount.

The court offers a *caveat*. Because Foster undoubtedly forewent her claim for punitive damages in anticipation of collecting $150,000 in actual damages, Renfro should itself anticipate that in the event it should, by appeal, obtain a setting aside of the $100,000 judgment and a new trial, the new trial will include Foster's claim of punitive damages, because that claim will automatically be reinstated. In all fairness, Foster's dismissal of her claim for punitive damages after the jury finding of "malice or reckless indifference," was made with the expectation by Foster that a judgment in the amount of $150,000 would be entered in her favor. If, after judgment is entered for $100,00, Foster desires

7

to file her own timely motion for a new trial pursuant to Rule 59, F.R.Civ.P., her motion will be granted, her claim for punitive damages will be reinstated, and the whole case re-tried.

An appropriate judgment will be separately entered.

DONE this 26th day of March, 1999.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE